**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Ryan Denke, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>  v.<br><br>Citibank, N.A.<br><br>               Defendant. | Case No. 1:18-cv-4133<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601,** *et seq.*<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

Pursuant to Fed. R. Civ. P. 23, Plaintiff Ryan Denke ("Plaintiff" or "Mr. Denke") brings this class action individually and on behalf of all other persons in the United States who incurred cash advance fees and/or cash advance interest charges on consumer credit cards issued by Defendant Citibank, N.A. ("Citibank" or "Defendant") upon purchasing cryptocurrency from Coinbase.com or another online digital assets exchange, Plaintiff makes the allegations set forth below based upon personal knowledge as to himself and his own acts and dealings with the Defendant and upon the investigation of his counsel.

**I.    INTRODUCTION**

1.    Cryptocurrency is a medium of exchange designed for the purpose of exchanging digital information through a process made possible by certain principles of cryptography. Cryptography is used to secure the transactions and to control the creation of what is known as digital coins or units. In the simplest of forms, cryptocurrency is software code with monetary value; in other words, it is digital currency. The first cryptocurrency to be created was Bitcoin in 2009. Today there are numerous other cryptocurrencies.

2.    Unlike centralized banking, where governments control the value of a currency like the U.S. dollar through the process of printing money, governments do not have control over cryptocurrencies as they are fully decentralized. Cryptocurrencies, however, can be exchanged

1

for fiat currencies in special online markets, meaning each has a variable exchange rate with major world currencies (such as the U.S. dollar, British pound, European euro, and Japanese yen). Every type of cryptocurrency is programmed to be finite in number and ultimately fixed in supply.

3.  In late 2012, certain merchants started to accept payment for their goods or services in Bitcoin. Dozens of merchants now view the world's most popular cryptocurrency as a legitimate payment method.

4.  Many consumers believe that cryptocurrency will be an integral component of the future of currency and place great value to owning cryptocurrency. In recent years, there has been a cryptocurrency boom.

5.  More popular cryptocurrencies, such as Bitcoin, trade on special secondary exchanges similar to forex exchanges for fiat currencies. These exchanges allow holders to exchange their cryptocurrency holdings for major fiat currencies, such as the U.S. dollar and euro. In return for their services, these exchange take a small cut of each transaction's value – usually less than 1%.

6.  Among such exchanges is "Coinbase" (www.coinbase.com). Coinbase is one of the largest cryptocurrency exchanges in the United States. Coinbase.com is owned and operated by San Francisco-based Coinbase, Inc., a privately-held company that allows consumers to buy and sell cryptocurrencies using an intuitive, user-friendly online interface.

7.  For the last several years, Coinbase has allowed consumers to purchase cryptocurrency online using their personal credit cards. Citibank and other major banks, likewise permitted their credit card customers to purchase cryptocurrency online. Whenever Citibank's credit cardholders did so, Citibank processed their cryptocurrency purchases from Coinbase and other exchanges as ordinary credit card "Purchases" (as hereinafter defined).

8.  Plaintiff and other Class members used their credit cards to buy cryptocurrency, not as a loan or a cash advance, but as a means to purchase cryptocurrency immediately via

Coinbase and other exchanges. Purchasing cryptocurrency with a bank account number would typically require several days of processing time and result in unnecessary delays in delivery. For years, Citibank consistently treated cardholders' cryptocurrency purchases as ordinary "Purchases" under Citibank's card member agreements.

9. However, beginning in late-January 2018, Citibank began treating its customers' cryptocurrency purchases not as ordinary credit card "Purchases" — as Citibank had for years — but instead as "Cash Advances" (as hereinafter defined) from Citibank to the credit cardholder. When Citibank implemented this change in late-January 2018, it did so without providing prior notice to its cardholders that their cryptocurrency "Purchases" would be now treated as "Cash Advances."

10. Consequently, in and after late-January 2018, Plaintiff and the Class continued to do what they had been doing for years, namely making cryptocurrency purchases via Coinbase and other exchanges using their Citibank credit cards. Unbeknownst to Class members, however, Citibank was now treating these purchases as personal cash loans or advances from Citibank, complete with new fees and higher interest rates.

11. Citibank's failure to give its cardholders fair notice caused them to unknowingly incur substantial cash advance fees and sky-high interest charges on their cryptocurrency purchases. This violates the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and Regulation Z promulgated thereunder, which aims to ensure that consumers obtain credit from financial institutions based on their informed consent. Had Citibank notified its cardholders, as required by law, in advance of making these changes to their credit card terms, Plaintiff and the Class would not have incurred millions of dollars in cash advance fees and interest charges by taking out personal cash loans from Citibank without their knowledge or consent.

12. Plaintiff and the Class seek, *inter alia*, a refund of all cash advance-related charges and interest levied against them by Citibank in connection with their cryptocurrency purchases.

## II. JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. The claims asserted herein arise under and pursuant to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* and the United States Consumer Financial Protection Bureau's "Regulation Z" promulgated thereunder, codified at Title 12, Part 1026 of the Code of Federal Regulations.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Citibank resides and transacts business in this District, and maintains its principal executive offices within this District. Many of the acts that constitute the violations of law complained of herein occurred in substantial part in this District.

## III. PARTIES

15. Plaintiff Ryan Denke is a citizen of the State of Arizona, residing in Peoria, Arizona and has been a Citibank credit card member since 2001. Mr. Denke opened his Citibank credit card account on which he made purchases of cryptocurrency on Coinbase in 2009. He made regular purchases of cryptocurrency on Coinbase.com using that Citibank credit card beginning in or about March 2017. Up until and including December 15, 2018, Citibank treated Mr. Denke's purchases on Coinbase.com as ordinary credit card "Purchases" under his cardholder agreement. But when Mr. Denke made an additional cryptocurrency purchase from Coinbase.com, using the same Citibank credit card, on February 2, 2018. Citibank suddenly treated *these* purchases as "Cash Advances," and assessed $38.97 in cash advance fees and $14.39 in cash advance interest charges to Mr. Denke. Despite calling Citibank's customer service line to complain about the unexpected charges on his account, Citibank declined to remove them. Plaintiff was forced to pay and did pay these unexpected cash advance charges in full.

16. Citibank did not attempt to notify Mr. Denke before he executed his cryptocurrency purchase in February 2018 — that such purchase would be treated as a "Cash Advance" rather than a "Purchase" under his credit card. Had Mr. Denke known that Citibank

4

was going to begin treating his customary purchases as cash advances, then Mr. Denke would not have used his Citibank credit card to buy cryptocurrency after Citibank's commencement of treating such purchases as Cash Advances, and would not have incurred or been forced to pay the cash advance fees and interest charges that Citibank levied against him.

17. Upon information and belief, Defendant Citibank is organized under the laws of the State of Delaware, has its principal place of business in New York, New York, and is one of the largest national banks and credit card issuers in the United States.

18. In late January 2018, Citibank abruptly altered its customers' credit card terms — without notice — such that any cryptocurrency purchases made by card members would be treated as "Cash Advances" rather than "Purchases." Citibank knew that many of its customers had long been using their Citibank credit cards to purchase cryptocurrency from Coinbase.com and other online cryptocurrency sellers. Citibank did not notify its cardholders that they would begin incurring cash advance fees and heft interest charges on all of their cryptocurrency purchases. During recent months, Plaintiff and other Class members have called Citibank's customer service line to complain about Citibank' surprise cash advance fees and interest charges. When Plaintiff and other Citibank cardholders have done so, Citibank has responded by summarily (and deceptively) placing the blame on Coinbase.

## IV. FACTUAL ALLEGATIONS

19. Citibank is one of the largest national banks and credit card issuers in the United States. Citibank issues a number of different credit cards to consumers nationwide.

20. Citibank-issued consumer credit cards come with substantially identical credit card member agreements. At all relevant times, each Citibank card member agreement has set forth the applicable interest rates and fees (if any) that apply to different types of credit card transactions. Each agreement offers some variable annual percentage rate (or "APR") for ordinary "Purchases," and a substantially higher APR for so-called "Cash Advances."

5

21. At all relevant times pertinent to this action, with respect to ordinary "Purchases," Citibank's credit card agreement has stated: "Your account use is subject to this agreement."

22. Citibank's "Definitions" section of its card agreement defines "Purchases" as follows:

> Purchase – Use of your Card to buy goods and services. Balance Transfers and Cash Advances are not Purchases."

23. Citibank's "Definitions" section of its card agreement defines "Cash Advance" as follows:

> Use of your Card to get cash, including foreign currency, or for what we consider a cash-like transaction. Examples include using your Card for: ATM and teller withdrawals, wire transfers, money orders, traveler's checks, lottery tickets, gaming chips and other methods used for gambling, wagers and other betting transactions.

24. Based on the above language, Citibank consistently and continuously treated Plaintiff's and all other card members' cryptocurrency purchases as ordinary "Purchases," as defined, up until late-January 2018.

25. On July 14, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $3,000. Citibank approved and processed this transaction as a standard "Purchase," and sent Plaintiff a July 2017 credit card statement (covering the billing period of June 20, 2017-July 19, 2017) reflecting the same. Citibank did not assess any "Cash Advance" fees or interest charges on this purchase.

26. On July 25, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $1,248.22 and $1,293.67. On July 31, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $2,073.48. On August 2, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $2,135.33. Citibank approved and processed these transactions as standard "Purchases," and sent Plaintiff an August 2017 credit card statement (covering the billing period of July 20, 2017-August 17, 2017) reflecting the same. Citibank did not assess any "Cash Advance" fees or interest charges on this purchase.

27. On September 5, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $1,550.91. Citibank approved and processed this transaction as a standard "Purchase," and sent Plaintiff a September 2017 credit card statement (covering the billing period of August 18, 2017-September 19, 2017) reflecting the same. Citibank did not assess any "Cash Advance" fees or interest charges on this purchase.

28. On December 8, 2017 and December 15, 2017, Plaintiff used his Citibank credit card to buy cryptocurrency from Coinbase for $5,414.03 and $568.58 respectively. Citibank approved and processed these transactions as standard "Purchases," and sent Plaintiff a December 2017 credit card statement (covering the billing period of November 18, 2017-December 19, 2017) reflecting the same. Citibank did not assess any "Cash Advance" fees or interest charges on this purchase.

29. On February 2, 2018, however, Plaintiff used his same Citibank credit card to buy cryptocurrency from Coinbase for $1,299.06. This time, without prior notice, and contrary to Citibank's longstanding card member terms with Plaintiff and the Class, Citibank approved and processed Plaintiff's cryptocurrency purchase as a *"Cash Advance,"* imposing a surprise cash advance fee of $38.97, as well as interest charges of $14.39. Plaintiff's Citibank February 2018 credit card statement (covering the billing period of January 18, 2018-February 19, 2018) reflects the same.

30. Citibank did not notify Plaintiff in advance of his February 2, 2018 transaction that Citibank intended to begin — or had recently begun — assessing "Cash Advance" fees and interest charges on any and all cryptocurrency purchases using a Citibank credit card. Instead, Citibank simply sent Plaintiff with a statement, after his transaction, and imposed payment. Plaintiff called Citibank's customer service line to dispute these fees and interest charges, but Citibank refused to remove them, thereby forcing Plaintiff to pay them to avoid further interest charges and/or delinquency.

31. Upon information and belief, between January 2018 and February 2018, Citibank assessed the same surprise cash advance charges against hundreds if not thousands of its other card members. Plaintiff and the Class routinely purchased cryptocurrency from Coinbase and other online cryptocurrency exchanges, without knowing that Citibank would assess lofty "Cash Advance" fees plus immediate high interest charges. Had Plaintiff and the Class been notified of this in advance, as required by law, then they would not have continued using their Citibank credit cards to purchase cryptocurrency.

32. Citibank's cash advance fees and interest charges against Plaintiff and the Class violate the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and Regulation Z promulgated thereunder by the Consumer Financial Protection Bureau. TILA and Regulation Z require credit card issuers, including Citibank, to give their cardholders 45 days written notice ***before*** implementing any "significant change" to cardholders' credit card terms. 15 U.S.C. § 1637(i)(2). "Significant change[s]" expressly include cash advance fees, as well as any other finance charges that apply to different types of transactions. By not attempting to notify (let alone effecting notice to) Plaintiff and the Class before assessing "Cash Advance" fees and interest charges against Plaintiff and the Class, Citibank violated the letter and spirit of TILA and Regulation Z, which aim to "assure the meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(1).

33. Had Citibank notified Plaintiff of its abrupt change to Plaintiff's credit card terms, then Plaintiff would not have used his Citibank credit card in February 2018 to buy cryptocurrency, and would not have incurred or been forced to pay the cash advance fee and interest charges. Plaintiff seeks complete relief from these cash advance charges, on his own behalf and on behalf of all other Class members.

## V.    CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). The Class that Plaintiffs seeks to represent is defined as follows;

> All persons and entities in the United States who, upon purchasing cryptocurrency from Coinbase.com or another online cryptocurrency exchange, incurred cash advance fees and/or cash advance interest charges on credit cards issued by Citibank.

Excluded from the Class are Citibank, the officers and directors of Citibank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Citibank has or had a controlling interest; the Court and its officers, employees, and relatives; and governmental entities.

35. **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members is impracticable. Leading up to and during January and February 2018, hundreds if not thousands of Citibank credit card members used their Citibank cards to purchase cryptocurrency from Coinbase.com and other online cryptocurrency exchanges. While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified and located from records maintained by Citibank and may be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

36. **Typicality**: Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law as complained of herein.

37. **Adequacy**: Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether Citibank violated TILA by failing to notify Plaintiff and all other Class members in advance of Citibank's sudden, unilateral change to their credit card accounts;

    b. whether Citibank, in fact, failed to provide Class members with advance written notice of Citibank's sudden, unilateral change to their credit card accounts;

    c. whether Plaintiff and the Class suffered damages as a result of Citibank's conduct, and the proper measure of such damages; and

    d. whether Plaintiff and the Class are entitled to statutory damages, as well as reasonable attorneys' fees and expenses, as a result of Defendant's wrongful conduct.

39. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult if not impossible for members of the Class to redress the wrongs done to them on an individual basis. There will be no difficulty in the management of this case as a class action.

## VI.   CAUSE OF ACTION

**FIRST CAUSE OF ACTION**
**(Violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and Regulation Z Promulgated Thereunder)**

40. Plaintiff hereby repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

41. In May 2009, Congress enacted the Credit Card Accountability Responsibility and Disclosure Act of 2009 (the "Credit CARD Act") to amend the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq. TILA's stated purpose was "to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms'. . . ." The Credit

CARD Act, and Regulation Z, with is both TILA and the Credit CARD Act's implementing regulation, "establishe[d] a number of new substantive and disclosure requirements to establish fair and transparent practices pertaining to open-end consumer credit plans, including credit card accounts." Truth in Lending, 75 Fed. Reg. 7658, 7658 (Feb. 22, 2010).

42. After enactment of the Credit CARD act, TILA at 15 U.S.C. § 1637(i)(2), requires credit card issuers to "provide a written notice of any significant change, as determined by rule of the [U.S. Consumer Financial Protection] Bureau, in the terms . . . of the cardholder agreement between the creditor and obligor, not later than 45 days prior to effective date of the change."

43. Under 15 U.S.C. § 1637(i)(2), the Consumer Financial Protection Bureau ("Bureau"), pursuant to its express authority, promulgated 12 C.F.R. § 1026.9(c)(2) which provides the following "Rules affecting open-end (not home-secured) plans," *i.e.*, credit card plans:

(i) Changes where written advance notice is required.

> (A) General. For plans other than home equity plans . . . , when a significant change in account terms as described in paragraph (c)(2)(ii) of this section is made, **a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change** *to each consumer who may be affected*.

12 C.F.R. § 1026.9(c)(2)(i) (emphasis added). "Significant changes in account terms" is defined in Section 1026.9(c)(2)(ii) as follows:

> For purposes of this section, a "significant change in account terms" means a change to a term required to be disclosed under § 1026.6(b) (1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.

12 C.F.R. § 1026.9(c)(2)

(ii). The credit card account terms specifically enumerated in 12 C.F.R.

§ 1026.6(b)(1), (b)(2) and (b)(4) include, but are not limited to, the following:

> Transaction charges. Any transaction charge imposed by the creditor for use of the open-end plan for purchases.

11

12 C.F.R. § 1026.6(b)(2)(iv).

> Cash advance fee. Any fee imposed for an extension of credit in the form of cash or its equivalent.

12 C.F.R. §1026.6(b)(2)(vii).

> Type of transaction. The type of transaction to which the [interest] rate applies, if different rates apply to different types of transaction.

12 C.F.R. § 1026.6(b) (4)(i) (C).

44. By consistently treating Plaintiff's and the Class's cryptocurrency purchases as "Purchases" under its card member agreements, and not imposing cash advance fees or interest charges and then changing Plaintiff's and the Class's routine cryptocurrency "Purchases" to be treated as "Cash Advances" in January 2018 — Citibank made a "significant change" to Plaintiff's and the Class's credit card terms within the meaning of 15 U.S.C. § 1637(i) (2) and Regulation Z.    45. Upon making this significant change to Plaintiff's and the Class's credit card terms, Citibank did not provide advance written notice of the change as required by 15 U.S.C. § 1637(i)(2) and Regulation Z.

46. In the alternative, Regulation Z provides as follows:

> [I]f a creditor increases any component of a charge, or introduces a new charge, required to be disclosed under § 1026.6(b)(3) that is ***not*** a significant change in account terms as described in paragraph (c)(2)(ii) of this section, a creditor must either, at its option:
>
> (A) Comply with the [45-day notice] requirements of paragraph (c)(2)(i) of this section; or
>
> (B) Provide notice of the amount of the charge ***before the consumer agrees to or becomes obligated to pay the charge***, at a time and in a manner that a consumer would be likely to notice the disclosure of the charge. The notice may be provided orally or in writing.

12 C.F.R. § 1026.9(c)(2)(iii) (emphasis added).

47. The credit card terms specifically enumerated in 12 C.F.R. § 1026.6(b)(3) include, but are not limited to, the following:

> For charges imposed as part of an open-end (not home-secured) [credit card] plan, ***the circumstances under which the charge may be imposed***,

>[and] the amount of the charge or an explanation of how the charge is determined.

12 C.F.R. § 1026.6(b)(3)(i) (emphasis added).

48. Plaintiff and other Class members would not have purchased cryptocurrency from Coinbase and other exchanges on or after the effective date of such changes using their Citibank credit cards if Citibank had provided Plaintiff and the Class with advance notice of its changes as required by TILA and Regulation Z. Consequently, Plaintiff and the Class would not have incurred Citibank's "Cash Advance" fees or interest charges, effectively taking out personal cash loans from Citibank without their knowledge or consent.

49. Pursuant to 15 U.S.C. § 1640(a), Plaintiff brings this claim on his own behalf, and on behalf of the Class defined above, to recover his and the Class's actual financial damages, plus statutory damages in the aggregate amount of $1 million, plus his costs of this action and reasonable attorneys' fees and expenses incurred therein.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, demands judgment against Defendant as follows:

    A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and Plaintiff's law firm as Class Counsel;

    B. Requiring Defendant to pay the actual damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

    C. Awarding Plaintiff and the Class additional statutory damages in the aggregate amount of $1 million pursuant to 15 U.S.C. § 1640(a);

    D. Awarding Plaintiff and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation; and

      E.    Awarding such other relief as the Court may deem just and proper.

### VIII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  May 8, 2018                                                     Respectfully submitted,

                                                          GERAGOS & GERAGOS, APC


                                                          By:      s/ Lori G Feldman
                                                          Lori G. Feldman., Esq.   (LF-3478)

                                                          7 West 24th Street
                                                          New York, New York 10010
                                                          Tel: (213) 625-3900
                                                          Fax. (213) 232-3255
                                                          lori@geragos.com

                                                          Mark J. Geragos (*pro hac vice*)
                                                          geragos@geragos.com
                                                          Ben J. Meiselas (*pro hac vice*)
                                                          meiselas@geragos.com
                                                          **GERAGOS & GERAGOS, APC**
                                                          Historic Engine Co. No. 28
                                                          644 South Figueroa Street
                                                          Los Angeles, CA 90017
                                                          Telephone: (213) 625-3900
                                                         Facsimile: (213) 232-3255

                                                          Christopher A. Seeger (CS-4880)
                                                          cseeger@seegerweiss.com
                                                          Stephen A. Weiss (SW-3520).
                                                          sweiss@seegerweiss.com
                                                          **SEEGER WEISS LLP**
                                                          77 Water Street, 8th Floor
                                                          New York, New York 10005
                                                          Telephone:  (212) 584-0700
                                                          Facsimile:  (212) 584-0799

                                                          Attorneys for plaintiff and
                                                          the proposed class